UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

TE-KON TRAVEL COURT, INC.,                          Case No. DK 04-01848
                                                    Chapter 11
                Debtor.                             Hon. Scott W. Dales
_____/

In re:

TE-KHI TRAVEL COURT, INC.,                          Case No. DK 04-01847
                                                    Chapter 11
                Debtor.                             Hon. Scott W. Dales
_____/

In re:

TE-KHI SERVICE CENTER, INC.,                        Case No. DK 04-01849
                                                    Chapter 11
                Debtor.                             Hon. Scott W. Dales
_____/

In re:

PETROLEUM HOLDINGS, INC.,                            Case No. DK 04-01850
                                                    Chapter 11
                Debtor.                             Hon. Scott W. Dales
_____/


**OPINION REGARDING MOTION TO ENFORCE PLAN**

PRESENT:   HONORABLE SCOTT W. DALES
           United States Bankruptcy Judge


**Background**

On three days in December, the court held a trial to resolve issues arising out of the

Motion to Enforce and Implement Terms of Fourth Amended Joint Plan of Reorganization or, in

the Alternative, to Convert Case (DN 486, the "Motion to Enforce") filed by U.S. Bank, National

Association ("U.S. Bank"), as Trustee for the benefit of FMAC Loan Receivables Trust, 1998-C, and U.S. Bank, as Trustee for the benefit of FMAC Loan Receivables Trust, 1998-D (the "Lenders").

The parties agree that the Lenders prematurely recorded certain deeds in lieu of foreclosure, prior to the expiration of a negotiated payment deadline, including a seven-day cure period (the "Cure Period"), before which the Debtor was to make a substantial balloon payment (the "Balloon Payment"). The Lenders argue that the error was harmless because the Debtor would not have been able to make the Balloon Payment before the Cure Period ended. The Debtor, in contrast, argues that the premature recording of the deeds interfered with its efforts to secure the funds needed to make the Balloon Payment, thereby excusing the Debtor's failure to pay.

To resolve these issues, the court heard testimony from six witnesses at trial and credits most of the testimony. In addition, the court admitted thirty-two exhibits into evidence, including three deposition transcripts taken in connection with this contested matter, under Fed. R. Civ. P. 32. This opinion constitutes the court's findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52.

## <u>Jurisdiction</u>

The court has jurisdiction over these cases under 28 U.S.C. § 157(a) and 1334(a) and (b). The Lenders' Motion to Enforce is a "core proceeding" within the meaning of 28 U.S.C. §157(b)(2)(A) and (O) because "bankruptcy courts retain jurisdiction to enforce and interpret their own orders." In re Wireman, 364 B.R. 297, 299 (Bankr. N.D. Ohio 2007) (citing In re Millenium Seacarriers, Inc., 419 F.3d 83, 97 (2d Cir. 2005)); 11 U.S.C. § 1142(b).

**Factual Findings**

Prior to filing their voluntary petitions under Chapter 11 on February 23, 2004 (the "Petition Date"), Te-Kon Travel Court, Inc., Te-Khi Travel Court, Inc., Te-Khi Service Center, Inc., and Petroleum Holdings, Inc.[1] owned and operated the Te-Kon truck stop near Tekonsha, Michigan, and the Te-Khi truck stop near Battle Creek, Michigan.[2] These four debtor companies filed their bankruptcy petitions on the eve of a Calhoun County Circuit Court hearing at which the Lenders, through their servicing agent, Capmark Finance, Inc. ("Capmark"),[3] intended to seek the appointment of a receiver to take control of the truck stops, following the Debtors' default under various loans.

After the Petition Date, the Debtors negotiated a settlement with the Lenders, and memorialized the terms in a settlement agreement dated June 8, 2005 (the "Settlement Agreement") and the Plan. See Exhibits 1 and 3. Under the Settlement Agreement as incorporated into the Plan, which the court confirmed on July 11, 2006, the Debtors agreed to pay the Lenders $50,033.83 each month for 12 months (the "Monthly Payment"), and make the final Balloon Payment of $5,935,000.00 by July 11, 2007 (the "Payoff Deadline"). The Settlement Agreement also provided that its terms could be modified only in a writing signed by all parties. See Exhibit 3, p. 9, ¶18.

---

[1] Pursuant to the Fourth Amended Joint Plan of Reorganization (the "Plan"), the four debtor entities were merged into a single entity, Te-Khi Travel Court, Inc., the grantor referenced in the quit claim deeds (the "Quit Claim Deeds") at issue in this proceeding. See Exhibit 1, 10 and 11. Although the parties from time to time referred to the "Debtors," the court will use the term "Debtor" to refer to Te-Khi Travel Court, Inc., the entity that survived the Plan's merger provisions, and will use the term "Debtors" to refer to the four pre-merger entities listed in the caption.

[2] The court will refer to the truck stop in Tekonsha as "Te-Kon" and the truck stop in Battle Creek as "Te-Khi."

[3] The Lenders retained GMAC Commercial Mortgage to service the Debtors' loans. Later, the servicer changed its name to Capmark Finance, Inc.

In exchange for a discounted payoff and more favorable payment terms, the Debtor agreed to place the Quit Claim Deeds into escrow, with instructions that the escrow agent deliver them to the Lenders upon the Debtor's default and the expiration of the Cure Period. The Lenders' counsel held the Quit Claim Deeds in escrow, under the Plan.

After confirmation, the Debtor made all Monthly Payments while its principals, Stephen K. Bedwell ("Dr. Bedwell") and his son Vincent Bedwell ("Mr. Bedwell," and with Dr. Bedwell referred to as the "Bedwells"), considered the best way to make the Balloon Payment. The testimony and other evidence established that the Debtor eventually elected to pursue two simultaneous but potentially inconsistent tracks. The first was a sale of the truck stops to a national truck stop chain; the other was the refinancing of the Te-Kon and Te-Khi debt through a new takeout lender.[4]

With good reason, the Bedwells believed the truck stops were desirable and marketable commercial properties. Testimony established that Roady's Truck Stops ("Roady's") and TravelCenters of America ("TA") both expressed serious interest in purchasing one or both of the truck stops. Discussions between the parties included proposed sale prices ranging from $2,000,000.00 to $3,900,000.00 for Te-Kon and $7,000,000.00 to $8,000,000.00 for Te-Khi. According to two Roady's officials, Paul Rogers ("Mr. Rogers")[5] and Kelly Rhinehart ("Mr. Rhinehart"),[6] Roady's was in an "expansion mode" in which it sought to increase through acquisition the number of family-run truck stops in its network. Mr. Rhinehart confirmed that Roady's expansion desire was fueled to some extent by a similar push from TA, a strong

---

[4] The potential for inconsistency was a matter of timing. If the sale closed before the refinancing, the refinancing would be unnecessary because the sale proceeds would have satisfied the Balloon Payment obligation.

[5] Mr. Rogers is the Chief Executive Officer of Roady's. Tr. p. 270, line 21.

[6] Mr. Rhinehart is President and 37.5% owner of Sky Capital Group which owns Roady's. Tr. p. 327, lines 4-6.

competitor.  As the owner of two truck stops along two distinct interstate trucking corridors, the Debtor found itself being courted, and it responded tentatively by keeping its options open.  As such, the Debtor avoided any binding commitments that might have precluded it from speaking with other suitors.  Consequently, by the early summer of 2007, TA had made an offer to purchase Te-Kon, which the Debtor had not accepted.[7]  Roady's, on the other hand, had not reduced an offer to writing, even though the Debtor's files contained what purported to be a letter of intent.[8]

Likewise, by the spring of 2007, the Debtor appeared to be on track to refinance its debt with Southwest Guaranty ("Southwest"), a non-traditional lender described as less risk-averse than most federally-regulated financial institutions.  Southwest proposed a loan in the amount of $6,350,000.00 -- an amount sufficient to meet the Debtor's Balloon Payment and other obligations under the Plan.  According to the Bedwells, the Debtor provided all the documentation requested by Southwest as part of its pre-loan due diligence.  As late as July 2007, the Bedwells optimistically believed the Southwest loan would produce enough proceeds to pay off the Debtor's Plan obligations, even though at that time Southwest had only issued a non-binding "Letter of Interest" setting forth a broad outline of possible refinancing.  The refinancing, if successful, would have bought the Bedwells time to effectuate a sale of the truck stops by permitting them to make the Balloon Payment and fend off the recording of the Quit Claim Deeds.  The Southwest loan would have imposed significant closing costs on the Debtor,

---

[7] On May 16, 2007, TA made a written offer to purchase the Te-Kon  truck stop for $3,900,000.00.  Exhibit 17.  The Debtor made a counter-offer on July 5, 2007.  Exhibit 18.

[8] In his testimony, Mr. Bedwell admitted to preparing the letter himself at the direction of Roady's.  See Exhibit 16; Compare Tr. at p. 561-62 (Mr. Bedwell testifies that he prepared Exhibit 16 at Mr. Rogers' request) with Tr. at pp. 287-88 and 307 (Mr. Rogers denies asking Mr. Bedwell to prepare Exhibit 16).  The court credits Mr. Rogers's testimony on this point.

**Page 6 of 17**

see Exhibit EE, and the Debtor was less than enthusiastic about closing the loan as long as a sale was in prospect.

Because the Payoff Deadline was fast approaching and the Southwest loan had not closed, Dr. Bedwell contacted Capmark about extending the Payoff Deadline to a later date. In a letter dated July 6, 2007, the parties agreed to extend the Payoff Deadline to July 26, 2007 (the "Amended Payoff Deadline," Exhibit 5). On July 6, 2007, the Bedwells knew they had not quite reached an agreement with Roady's as there was no written offer, and must have known they could not complete a sale by July 26, 2007. It is therefore reasonable to infer that the Debtor bargained for such a short extension because it assumed the Southwest loan would close by the Amended Payoff Deadline.

Unfortunately, on or about July 20, 2007, Southwest informed the Debtor that instead of a loan for $6,350,000.00, it was only willing to advance $5,850,000.00. See Exhibit EE. This amount fell approximately $900,000.00 short of what was required to pay off the Lenders and satisfy the Debtor's other obligations, such as taxes and closing costs. This left the Debtor needing to make up the difference in the form of an equity infusion or some other accommodation.

When Dr. Bedwell received this news, he contacted his long-time neighbor and friend, Dr. Jay Larson ("Dr. Larson"), about a short-term bridge loan to make up the difference between the Southwest loan as originally proposed, and the Southwest loan as recently reduced. Dr. Larson credibly testified that he had sufficient assets, and he thought enough of Dr. Bedwell, to make a short-term loan to the Debtor by tapping some relatively liquid Eaton Corporation stock and other retirement assets. He made it clear to Dr. Bedwell, however, and later to the court, that he was only willing to make the loan with Dr. Bedwell's assurance that one or more of the truck

stops would be sold before the end of 2007 and that he would be paid back immediately upon the closing.  Thus, Dr. Larson's willingness to make up the shortfall was contingent upon the quick sale of a truck stop.

From this point forward, the two options that once lay before the Debtor -- the sale or the refinancing -- out of necessity become two aspects of a single integrated transaction.  In other words, for the Debtor to complete its Plan, both the refinancing and the sale had to occur, and they had to occur in quick succession.  Unnecessarily complicating the transaction however, was the fact that the Bedwells never fully informed the Lenders, Capmark, or Southwest, about all the moving parts of their machinations.[9]  This caused the Lenders and Capmark to act in ignorance of the Debtor's herculean efforts to comply with the Plan.[10]

The Debtor did not make the Balloon Payment by the Amended Payoff Deadline of July 26, 2007.  The next day, the Lenders recorded the Quit Claim Deeds.  They admit their recording was premature because it occurred before the end of the Cure Period.  On July 30, 2007, the Lenders sent agents from Trigild, a repossession company, to take possession of the truck stop properties.  The Debtor's employees on site strenuously objected and after Mr. Bedwell invoked the Cure Period provision, Trigild agents left the premises, and did not return.

The Debtor alleges that at this point an agent of the Lenders, someone from either Capmark or Trigild, telephoned Mr. Rhinehart on his private number at Roady's to tell him the Quit Claim Deeds had been recorded and to inquire whether Roady's wanted to continue to

---

[9] Roady's did not know about the Debtor's agreement with the Lenders regarding the Amended Payoff Deadline. Tr. p. 317, line 25 to p. 318, line 8.  The Lenders did not know about a possible sale.  Tr. p. 480, lines 2-14.  The Lenders did not know that in order for the Debtor to get refinancing from Southwest, it needed a bridge loan.  Tr. p. 482, lines 6-18.  Neither the Lenders nor Southwest knew about Dr. Larson and his willingness to make a bridge loan.  Exhibit 32 at p. 26, lines 6-10.  Dr. Larson did not know Southwest had not actually approved a loan.  Tr. p. 408, lines 10-13.

[10] In this respect, the Debtor resembled Tantalus more than Hercules.

purchase or else manage the Te-Khi and Te-Kon truck stops.[11]  Mr. Rhinehart confirms that he received a telephone call from an unidentified caller regarding efforts to regain control of the truck stops,[12] and the telephone call dissuaded his company from pursuing the sale any further. Mr. Rogers advised the Bedwells of Roady's decision, and Dr. Bedwell promptly and commendably told Dr. Larson that the deal had fallen through.  Dr. Larson immediately withdrew his offer to fund the bridge loan.

Roady's immediately lost  interest in acquiring the Debtor because Roady's management believed that the marketplace in which the company operates -- with independent truckers and truck stop owners -- would condemn Roady's for being involved in any way with purchasing a truck stop from a bank or as part of any bank collection activity.  In other words, Roady's was concerned about protecting its brand.  As Mr. Rogers explained, if Roady's purchased the Debtor's truck stop as part of a distress sale transaction, members of the small, close-knit trucking community would assume Roady's had something to do with orchestrating the foreclosure or profiting from the Debtor's financial distress.  According to both witnesses from Roady's, this assumption (rational or not) would have damaged Roady's reputation immeasurably because the independent truckers and truck stop operators upon whom Roady's livelihood depends would be offended by any such transaction.  Mr. Rogers testified:  "[i]f it

---

[11] The Debtor also suggested that the Lenders made a similar telephone call to TA.  However, as their counsel conceded in closing argument, there was no evidence of such a call.  Tr. p. 601, lines 14-15.

[12] As Mr. Rhinehart began to testify about the July 30, 2007 telephone call, the Lenders' counsel asserted a hearsay objection.  The court overruled the objection on the ground that the fact of the conversation was important because of its effect upon Mr. Rhinehart and Roady's purchase decision, and because the Lenders were free to test Mr. Rhinehart's testimony (veracity, perception, memory) by cross-examining him.  Mr. Rhinehart was unable to identify the speaker on the other end of the phone, but to the extent the speaker's words were offered for the truth of the matter asserted -- *e.g.*, "I represent the bank" -- this statement  is hearsay.  Because the court perceived the Debtor was offering Mr. Rhinehart's recounting of the conversation to establish the effect it had on Roady's, the court allowed the testimony.  Therefore, the court does not accept Mr. Rhinehart's recounting of the phone call as evidence of the identity of the speaker, but only for the fact that the conversation took place.  As confirmed in several witnesses' testimony, the trucking/truck stop community is a small one, and any number of people could

would be perceived that we in any way, shape, or form were involved or orchestrated part of this, our credibility would have been zilch and our livelihood would have suffered." See Tr. at p. 319, line 23 to p. 320, line 1.  Mr. Rhinehart confirmed the importance to Roady's of not being perceived as precipitating the Debtor's demise:

> If it ever looks like you have been back dealing with a bank on the back side of something, or even bankruptcy trustees, we've had calls from them as well, and if people can -- if the truck stop operators think that you are involved with those dealings, negotiations, it's just not good.

See Tr. at p. 351, line 22 to p. 352, line 2.  The truck stop community is a small one, where there are "no secrets" and "[e]verybody sort of knows what everybody else is doing . . ."  Tr. at p. 278, lines 18-19.

Therefore, the court infers that Roady's would have been unwilling to risk offending its customer-base by purchasing the Te-Khi truck stop as soon as it learned the Lenders were undertaking collection activity of any kind.  Indeed, Mr. Rhinehart unequivocally testified that even if the Lenders had immediately re-delivered the Quit Claim Deeds to the Debtor, Roady's would have nevertheless eschewed the transaction.  The following colloquy between Debtor's counsel and Mr. Rhinehart is instructive:

> Q.  If the bank had said, hey, we'll simply re-deed the properties to Bedwells at closing, would that have affected your decision?
>
> A.  No, we wouldn't have done it at that point because same as my earlier response, just as the industry would see that wouldn't be good.

See Tr. at p. 353, lines 5-10.  Mr. Rogers's testimony was slightly less clear on this point, but corroborated Mr. Rhinehart's views:

---

have made the call including an agent from U.S. Bank, Trigild, Capmark, TA, or just as likely, someone from the Debtor's organization, who was either curious or unhappy about the sale.

> If the Bedwells owned it and the bank was not involved in it at that time, we would have been interested. But as long as the bank was involved in any foreclosure or anything like that, we felt that we could not be involved with it at all.

See Tr. at p. 296, lines 10-13. Therefore, any resumption of collection activity, including giving notice of default after the Amended Payoff Deadline, would have scared Roady's away from the sale. Seven days after the Amended Payoff Deadline was not a date by which Roady's could have closed the sale. See Tr. p. 366, lines 6-15.

Even if everything had gone smoothly and Roady's had pursued its interest in the truck stops, Mr. Rhinehart explained that a closing would not have occurred until November or December, 2007. See Tr. at pp. 288-91 and 339-41. Because Roady's had not even decided to purchase the Te-Khi truck stop until late June or early July, 2007, and had not retained counsel for this purpose by late July, 2007, the sale schedule on which Roady's was operating was not going to meet the Debtor's needs, regardless of the recording of the deeds. See Tr. at p. 289, lines 15-16.

Thus, although the Debtor argues that the Lenders' supposed interference with the sale to Roady's caused Dr. Larson to withhold his short-term bridge loan, which in turn caused the Southwest loan to fail, the court finds that Roady's never would have consummated its purchase of either truck stop in time for two reasons. First, on September 28, 2007, Roady's immediately stopped acquiring any and all truck stop properties because of certain closely watched economic indicators regarding a downturn in freight traffic. Tr. at p. 356, lines 15-25 to p. 357, lines 1-3. Therefore, even if Roady's and the Debtor were in the middle of drafting sale documents at that time, the process would have come to a screeching halt on or around that day. In fact, Roady's has not acquired a single truck stop to this day. Tr. at p. 357, lines 4-8. Second, the sale would not have moved forward once Roady's learned the Debtor had escrowed the Quit Claim Deeds,

the Amended Payoff Deadline had passed, and the Lenders were resuming collection activity. Had the Lenders given the written default notice as contemplated in the Settlement Agreement rather than recording the Quit Claim Deeds, the Debtor would not and could not have made the Balloon Payment within the Cure Period.

As for holding the Lenders responsible for telling Roady's about the repossession efforts, the Debtor did not persuade the court by a preponderance of the evidence that the Lenders or their agents contacted Roady's after prematurely recording the Quit Claim Deeds.[13]   Indeed, the possibility that someone associated with the Debtor impersonated the Lenders or their agents on the phone seems as likely because:  (1) the caller used Mr. Rhinehart's private phone number which was not widely known (see Tr. at p. 347, lines 12-18); (2) the caller knew about the possible sale between the Debtor and Roady's, asking whether Roady's was interested in "continuing with your purchase" (Tr. at p. 347, lines 23-24); and (3) the caller knew the Lenders' agents were in the process of repossessing both truck stops (Tr. at p. 347, line 22).  The Debtor's principals had access to each piece of information.  The Lenders and their agents did not.

It also seems implausible, and the court will not infer, that the Lenders had access to the proposed purchaser's private phone number if they were not even aware that a sale was in prospect, let alone a sale to Roady's.  Indeed, Don Bius, the Debtor's primary contact at Capmark said, "I don't recall any conversation whatsoever in any shape, form or fashion of the sale of the business."  See Exhibit 25, p.103, lines 8-10.  Suffice it to say that the evidence does not preponderate in favor of finding that the Lenders or their agents called Roady's.

---

[13] The defense to the Motion, admitting the default but attempting to avoid consequences by pointing to the Lenders' supposed misconduct, is akin to an affirmative defense with respect to which the Debtor must shoulder the burden of proof.

**Page 12 of 17**

The other leg upon which the Debtor's hopes stood -- the Southwest refinancing -- was similarly hobbled by events unrelated to the Lenders' premature recording of the Quit Claim Deeds. According to the *de bene esse* deposition of Southwest's CEO, Mr. Williams, who served as the underwriter for the Debtor's proposed refinancing, Southwest did not fund the loan in part because it had lingering concerns about environmental issues at the truck stops (see Exhibit 32 at pp. 50, 51, 58, 59, 100), but mostly because the Debtor had not satisfied Southwest that it could come up with the additional equity needed to make the math work. See Exhibit 32 at p. 51. At trial, the Debtor attempted to persuade the court that Dr. Larson's bridge loan would do the trick, but in his deposition, Mr. Williams could not recall ever hearing from the Debtor about how it intended to satisfy the shortfall between the obligations to be paid at the closing of the refinancing and the Southwest loan proceeds. Exhibit 32, p.26, lines 2-10. Further, Mr. Williams dismissed the suggestion that the premature recording of the Quit Claim Deeds had any effect on Southwest's decision.[14] From Southwest's point of view, ignorant of Dr. Larson's agreement to provide the short-term bridge loan, the numbers simply did not add up to a loan they could close. Therefore, the withdrawal of Dr. Larson's bridge loan was irrelevant because Southwest did not have timely knowledge of it.

As for the supposed environmental issues which troubled Mr. Williams, the testimony at trial suggested the issues were quite manageable, yet there was nothing to suggest that Mr. Williams shared this view of the problem. The actual magnitude of any contamination or potential contamination at the truck stop is immaterial if Southwest had a different opinion, right or wrong, and if this opinion affected its lending decision, as Mr. Williams testified.

---

[14] Certainly, if the Debtor did not have title to the truck stops that would support Southwest's mortgages, the deal could not go forward. But, as a sophisticated lender, Southwest regarded the recorded deeds in lieu of foreclosure as simply an issue for the title company to address at closing, as long as the loans were otherwise feasible.

The Bedwells simply ran out of time once Southwest decided not to fund the loan in the amount originally predicted in Mr. Williams's February 27, 2007 Letter of Interest, and the parties upon whom the Debtor's success depended were largely in the dark about significant details of the various interrelated transactions.

Under the circumstances, adherence to the Cure Period would have been an exercise in futility.  See In re East West Trade Partners, Inc., 2005 WL 2237696 (D.N.J. 2005); Sea Tow Services International, Inc. v. Pontin, 607 F. Supp.2d 378, 389 (E.D.N.Y. 2009).  Moreover, after the Lenders recorded the Quit Claim Deeds and the repossession agents appeared on the Debtor's premises, the Debtor clearly had notice of the default in making the Balloon Payment.

Because of Roady's idiosyncratic aversion to any involvement with a distress sale, and because of the Debtor's failure to apprise Southwest that it had solved the environmental concerns by obtaining insurance, and the equity shortfall by arranging Dr. Larson's bridge loan, the sale and the refinancing fell apart for reasons unrelated to the Lenders' hasty recording.  In short, the Debtor failed to establish by a preponderance of the evidence a causal link between the premature recording of the Quit Claim Deeds and its inability to sell or refinance the truck stops.

The Debtor's argument premised on the Lenders' forbearance does not undermine the court's conclusions.  The Lenders, who had sought payment through pre-bankruptcy state court receivership proceedings, and then participated in pre-confirmation proceedings in this court, and then awaited final payment for more than a year after confirmation, and then agreed to a modest extension of the Payment Deadline, had clearly reached the end of their rope on July 26, 2007 and decided to exercise their rights.  As it turned out, due to the mistakes of their agents, including counsel, the Lenders prematurely recorded the Quit Claim Deeds without first giving the default notice contemplated in the Settlement Agreement.  Regardless, it is clear the Lenders

had decided to resume collection activity, despite these missteps. As a practical matter, the Debtor is complaining not that the Lenders prematurely recorded the Quit Claim Deeds, but that the Lenders resumed collection activity. Whether Roady's had learned that the Lenders had given the default notice or padlocked the truck stop doors, its response would have been the same: no deal.

As for the Debtor's suggestion that the Amended Payoff Deadline of July 26, 2007 was changed to August 13, 2007, even though the Settlement Agreement itself purports to prevent parol modification, it is true that as a matter of Michigan contract law, contracting parties "are free to mutually waive or modify their contract notwithstanding a written modification or anti-waiver clause," so long as the parol modification does not offend a statute of frauds. Quality Products and Concepts Co. v. Nagel Precision, Inc., 469 Mich. 362, 364 (2003); Reid v. Bradstreet Co., 256 Mich. 282, 286 (1931) ("It is well established that a written contract may be varied by a subsequent parol agreement unless forbidden by the statute of frauds; and that this rule obtains though the parties to the original contract stipulate therein that it is not to be changed except by agreement in writing."). The freedom to contract necessarily includes the freedom to make a new contract on the subject of a prior contractual undertaking.

In Michigan however, a promise by a financial institution "to renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation" is not enforceable unless "the promise or commitment is in writing and signed with an authorized signature by the financial institution." See M.C.L. § 566.132(2). Thus, at most, the Lenders entered into an enforceable agreement to extend the Payoff Deadline until midnight on July 26, 2007.

Of course, a lender may forbear from exercising its collection rights with or without an agreement, but without an agreement that complies with the statute of frauds, such forbearance is a matter of grace or inattention, not a binding contract. The Lenders' informal forbearance into August and beyond was the result of Capmark's chagrin for having overlooked the default notice and cure provisions of the Settlement Agreement, plus Mr. Rickard's inattention to the file after the original account manager, Don Bius, and other staffers left Capmark's employ. After the Amended Payoff Deadline, the Lenders still regarded the refinancing as "illusive" but they left the Debtor alone because they were interested in tightening their ability to take control in February, provided the Debtor continued making payments. See Tr. at pp. 235 and 255-56. Significantly, the parties did not sign a formal forbearance or extension agreement, other than Exhibit 5. Although the parties settled into an uneasy and informal détente for a few more months, the Lenders had no obligation to forbear beyond the Amended Payoff Deadline.

## Conclusion and Remedy

The Debtor simply underestimated the skittishness of Roady's and the exasperation of the Lenders. Even assuming, contrary to the court's conclusion, that Roady's would have continued with the sale negotiations after learning that the Lenders had resumed collection activity, the court finds that Roady's would not have been prepared to close on any sale by the Amended Payoff Deadline of July 26, 2007 or even mid-August, 2007, with or without a seven day Cure Period. Similarly, as to Southwest's refinancing, the Debtor could not secure the refinancing in time to meet the Amended Payoff Deadline. The premature recording of the Quit Claim Deeds was immaterial, and provides no basis to relieve the Debtor from its obligation under the Plan and Settlement Agreement. A proper default notice would have had the same effect, because it

was impossible to cure the default within seven days after the Amended Payoff Deadline, given the Debtor's unhappy circumstances.

The court has considered whether to convert the cases to Chapter 7, and finds cause under 11 U.S.C. § 1112(b)(8) (pre-BAPCPA) because the Debtor failed to make the Balloon Payment as required. Nevertheless, based upon the Bedwells' uncontested testimony, the court finds that the Debtor has complied with its plan obligations other than those owed to the Lenders. Because the Plan's terms vested the property of the estate in the Debtor, there is no meaningful bankruptcy estate to consider. See Exhibit 1 at p. 14; 11 U.S.C. § 1141(b). As such, the court concludes that converting this proceeding to Chapter 7 under these circumstances would add unnecessary expense and delay to a case that has been pending for nearly six years and has, in the interim, become a two-party dispute.

Before concluding, the court notes that the Quit Claim Deeds may stand, as recorded, in lieu of foreclosure with respect to the Debtor's former real estate, but they do not effect a foreclosure or disposition of any of the Debtor's interests in personalty. The court also notes that in their Settlement Agreement the Debtors agreed to immediately surrender the premises to the Lenders upon the delivery of the Quit Claim Deeds. Because the court is enforcing the Settlement Agreement as incorporated in the Plan, it is unwilling to modify this provision, despite the potential practical difficulties arising from this aspect of the parties' bargain.

Finally, to the extent the Lenders requested, at the conclusion of trial and again in their post-trial filing, an order requiring the Debtor to pay the real estate taxes that came due after the recording of the Quit Claim Deeds, the Lenders' covenant not to sue precludes such relief. More specifically, the Lenders agreed that upon acceptance and recording of the Quit Claim Deeds, they would "forbear from initiating legal proceedings against the Debtors based upon any claims

. . . which the [Lenders] have, had, or may have arising out of the obligations which are the subject of this Settlement Agreement." See Exhibit 3 at p. 8.  The Debtor's obligation to pay taxes, though it survives and remains secured by the mortgages in accordance with the Settlement Agreement, nevertheless arises out of the prepetition loan documents, and therefore comes within the Settlement Agreement's covenant not to sue.  In addition, the effect of the order granting the Motion to Enforce is to permit the Lenders to retain the benefit of recording the Quit Claim Deeds.  This benefit comes with the burden of ownership, including the obligation to pay taxes.

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1.      The Motion to Enforce  (DN 529) is GRANTED in part and DENIED in part;

2.      The Debtor shall immediately surrender control and possession of the premises described in the Quit Claim Deeds to the Lenders, and shall transfer and assist in the transfer of all licenses and permits necessary for the operation of the businesses to the Lenders, or their designees;

3.      To the extent the Motion to Enforce sought to convert these cases to Chapter 7, the Motion is DENIED.

IT IS FURTHER ORDERED that the Clerk shall enter a copy of this Opinion and Order in the docket of each of the Debtors' cases, and serve a copy pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon John T. Piggins, Esq., Matthew Boettcher, Esq., and Dean E. Rietberg, Esq.

END OF ORDER

**IT IS SO ORDERED.**      Scott W. Dales
United States Bankruptcy Judge   **Dated: February 08, 2010**